299 F.Supp.2d 952 (2004)
DARST-WEBBE TENANT ASSOCIATION BOARD, et al., Plaintiffs,
v.
ST. LOUIS HOUSING AUTHORITY, et al., Defendants.
No. 4:99CV354SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 6, 2004.
*953 *954 Ann B. Lever, Daniel K. Glazier, Laura V. Brink, Susan M. Alverson, Legal Services of Eastern Missouri, John J. Ammann, St. Louis University, St. Louis, MO, for Plaintiffs.
Bonnie Rivera, Robert A. Graham, Reno and Cavanaugh, Washington, DC, James C. Hetlage, Margaret M. Mooney, Lashly and Baer, P.C., St. Louis, MO, Harold J. Rennett, U.S. Department of Housing and Urban Development, Washington, DC, Wesley D. Wedemeyer, Office of U.S. Attorney, St. Louis, MO, for Defendants.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This matter is before the Court on the Mandate of the United States Court of Appeals for the Eighth Circuit (# 213). This case arose out of the planned (and currently proceeding) revitalization of the Darst-Webbe Family and Clinton-Peabody public housing developments on the Near South Side of the City of St. Louis. In January of 1995 the United States Department of Housing and Urban Development ("HUD") approved the St. Louis Housing Authority's ("SLHA") request for a $46.7 million HOPE VI grant to revitalize the Darst-Webbe public housing development. After several changes and delays, the SLHA submitted a four-phase, Darst-Webbe/Near Southside HOPE VI Revitalization Plan Statement ("Revitalization Plan") which also called for the demolition of public housing apartments at the nearby Clinton-Peabody public housing development. The Revitalization Plan was also predicated on the City of St. Louis' use of a $20 million of § 108 loan guarantee to finance infrastructure improvements throughout and adjacent to the development. Plaintiffs brought a nineteen count *955 complaint against SLHA and the Federal Defendants challenging inter alia the demolition of public housing units at Clinton-Peabody with the use of HOPE VI funds on the grounds that HUD had not properly determined that the Clinton-Peabody public housing development qualified as "severely distressed public housing" as required by the HOPE VI statute, the SLHA and HUD had discriminated against the Darst-Webbe and Clinton-Peabody tenants on the basis of race, sex, and familial status, and that HUD had failed to affirmatively further fair housing as required by statute. On December 14, 2001, this Court entered a final judgment, and enjoined all Defendants from expending any HOPE VI funds on the Clinton-Peabody development until such time that HUD might properly determine that the Clinton-Peabody development qualifies as "severely distressed public housing" as that term is defined in 42 U.S.C. § 1437v(j)(2)(A). The remaining sixteen counts were resolved in favor of SLHA and HUD.
Plaintiffs appealed a host of issues, and in an Opinion published at 339 F.3d 702, the Eighth Circuit affirmed in part and remanded this case to this Court for further explanation of our conclusions on Counts I[1], II[2] and III[3] against Defendant SLHA, and Counts XIII[4], XVII[5] and XVIII[6] against Defendant HUD. Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority, 339 F.3d 702, 715 (8th Cir.2003). The Court has neither heard new arguments nor taken new evidence since receiving the Eighth Circuit's Mandate, nor have the parties requested leave to file any new submissions with this Court. The Court endeavors to follow closely the Opinion and Mandate of the Eighth Circuit in providing further explanation.

Discrimination Claims Against the SLHA
First, the Court was directed to more thoroughly explain the factual and legal basis for its conclusion that the Plaintiffs provided no evidence of discrimination based on race, sex or familial status as alleged in Counts I, II and III, respectively, and as alleged in Counts XIII, XVII & *956 XVIII. To support their claims of discrimination, the Plaintiffs presented the expert report and testimony of Dr. Paul B. Fischer. See Pltfs. Summary Judgment Exhibits, Vol. X, pp. 203901-203914; Trial Transcript (Doc. No. 190). Dr. Fischer's report and testimony asserted a very simple theory best summarized by the following excerpt:
Thus, whether we look at specific household income categories or at families below the poverty level, it is clear that African-Americans are more likely to be in the lower-income categories than the population in general and white population in particular. Since low-income families... must compete for a limited number of "affordable" housing units, any loss of low-income housing units will disproportionately impact African-American households and families.
Expert Report of Paul B. Fischer, Pltfs. Summary Judgment Exhibits, Vol. X, at 203903.
Dr. Fischer likewise found that "[c]hildren are also over-represented among poverty families" and that the "typical St. Louis family living in poverty in 1989 was an African-American family with a female head, no male present and with at least one child under 18 years of age." Id. From these data, Dr. Fischer extrapolates that "any decrease in the number of available low-income housing units would disproportionately affect female heads of households and children. Female African-American heads of households and their children would be especially affected." Id. at p. 203904. The problem with Dr. Fischer's initial analysis is that he utterly fails to explain how the city-wide figures he cites have any relationship to the Plaintiffs herein (e.g. by showing that they have applied for or otherwise seek access to the same housing opportunities as the Plaintiffs). Moreover, although he goes on to discuss the demographics of the residents of Clinton-Peabody, the only conclusion reached by Dr. Fischer is that "the planned demolition at Clinton-Peabody [will] exacerbate the existing housing crisis in St. Louis by reducing further the number of units potentially available to these adversely affected groups." Id. at 203905. Therefore, according to Dr. Fischer, any reduction of density will harm the low-income population as a whole, and is thus per se discriminatory because the low-income population  who are presumably eligible for public housing  consists of a majority of members of protected classes. Dr. Fischer's analysis proves unhelpful because he fails to establish that the Plaintiffs' alleged injuries in this case even exist, much less that they are somehow different from those allegedly visited on the entire St. Louis population of impoverished persons. Finally, Dr. Fischer fails to connect up any of the Defendants' activities with discrimination.
During cross-examination, Dr. Fischer revealed the primary logical shortcoming of his analysis; his contention that the makeup of the low-income population meant that any action having an adverse impact on the low-income population would necessarily have an adverse impact on protected classes:
Q. ... looking at the lowest three income categories... tell me if I am mischaracterizing your testimony  that if there were no adverse effect, you would expect to see representation of African Americans across all income levels, is that correct?
A. That's not what I said.
Q. Okay, can you explain to me what you did say.
A. I said that if there was no adverse effect, that the percent of African-American households at the three lowest *957 levels would be the same as their percent of all households.
So in other words, if African-Americans were, let's say, 40 percent of households, there would be no adverse impact if 40 percent of the families who were at the bottom three income levels were African-American, because they would be equivalent to their percent in the population.
But they are not.
Again, as I say, compared to whites, there is a much higher proportion for the three low income categories that the percentage in the population  percentage of all households.
Q. Now, I don't mean to be obtuse or anything, but when you say adverse effect, what do you mean?
A. I mean that they are disproportionately at the low end of the income levels, and consequently are adversely affected by the small number of public housing units that are replacement units at Darst-Webbe Hope [VI].
Q. Okay. I just wanted to make clear that you are not suggesting that somehow any of the Housing Authority's actions have caused the income distribution [cited in your report]?
A. That's correct.
Cross-Examination of Dr. Paul B. Fischer, Trial Transcript (Doc. No. 190) pp. 33-34.
Further, Dr. Fischer dynamically illustrated the fact that the provision of additional units would have no impact on the racial disparities inherent in the demographics of St. Louis' economic classes:
Q. You don't have a prediction in your report as to the number of Clinton-Peabody and Darst-Webbe residents that would be displaced from the Near South Side revitalization area as a result of [the Hope VI plan]?
A. That's correct.
Q. And, Professor Fischer, you did not make a prediction in your report as to the likely demographic characteristics as to the families that will occupy any newly constructed units developed as part of the [Hope VI plan], for instance the market rate rental units, the low-income housing tax credit units, the affordable home ownership and the market rate home ownership units, is that correct?
A. Explain what you mean by population mix or  If you are talking about racially or talking about in terms of income?
Q. Any demographics [sic] characteristics, aside from income, any demographic characteristics?
A. Correct.
Id. at pp. 43-44.
Thus, Dr. Fischer's conclusions were based entirely on his contention that SLHA and HUD acted in a discriminatory manner whenever their actions might have some impact on the low-income population of St. Louis because that population was predominantly made up of protected classes. The absence of a comparison group to which the affected residents could be compared means that Dr. Fischer's study cannot support the Plaintiffs' claims of discrimination. Teamsters v. United States, 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("`[e]vidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants' undermines the significance of such figures."). Thus there is no basis for the Court to find either disparate impact or purposeful discrimination because the Plaintiffs in this case cannot be shown to have been treated differently than any other group of similarly situated persons. Now if Dr. Fischer had, for example, researched and concluded *958 that the revitalization plan would necessarily displace more persons who are African-American than persons who are white, he might have demonstrated some discrimination. As he admitted on cross-examination however, he only showed that a majority of the population of Clinton-Peabody and Darst-Webbe were African-American, and that a certain number of tenants would be displaced. Further, the record fails to support the Plaintiffs' allegations that HUD and the SLHA "consign[ed] the displaced Darst-Webbe Family Households to live in racially segregated public housing developments" as alleged in Counts XIII, XVII & XVIII.
Dr. Debra Gross, who testified for the SLHA, actually conducted a comparison study, and she found that there was virtually no relevant demographic difference between the population served by the SLHA as a whole, and the Plaintiffs. Direct Examination of Dr. Debra Gross, Trial Transcript (Doc. No. 187), pp. 15-18. Dr. Gross further explained that Dr. Fischer's comparison of the tenant population at Darst-Webbe and Clinton-Peabody to the low-income population of St. Louis as a whole was "not a fair comparison" because his technique "overgeneralizes the low income population in the City of St. Louis." Id. at 18-19. What Dr. Fischer's methodology and reasoning produced was the absurd result that "anything that the housing authority does [with respect to low-income St. Louisans] would have a disparate impact." Id. at 20. For these reasons the Court found that Plaintiffs evidence failed to show any discrimination.
Without any evidence of discrimination, Plaintiffs are unable to establish an essential element of their prima facie case, as required in controlling Circuit precedent including United States v. Badgett, the case the Eighth Circuit cited as setting out the proper test for this Court to apply in explaining our analysis of the facts of this case. Darst-Webbe, 339 F.3d at 712 (citing United States v. Badgett, 976 F.2d 1176 (8th Cir.1992)). In Badgett, the Court held that the three-part burden shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) was the proper approach for evaluating claims of discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604(a) & (b). Badgett, 976 F.2d at 1178. The elements of a prima facie case of discrimination vary depending on the allegations and circumstances of the case before the court. Id.; see also Oti Kaga, Inc. v. South Dakota Housing Development Authority, 342 F.3d 871, 882-3 (8th Cir.2003).
In the case at bench, the Court concludes that Plaintiffs must show that (1) they are within a protected class, and (2) that similarly situated non-members of the class were subject to disparate treatment. Cf. Oti Kaga, Inc., 342 F.3d at 883 (applying the burden shifting analysis to claims of disparate impact discrimination in housing grant distributions); Badgett, 976 F.2d at 1179; Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, (2nd Cir.1979); U.S. v. City of Black Jack, Missouri, 508 F.2d 1179, 1184 (8th Cir.1974) ("To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect"). Plaintiffs' proof at trial fell short of this standard. Rather than showing that Defendants' actions discriminated against members of a protected class, Plaintiffs have instead shown that all similarly situated residents of the Darst-Webbe and Clinton-Peabody sites have been treated similarly (in fact, these individuals and families have received preferential treatment as compared to those on *959 the SLHA's public housing waiting list as the former were given preference for low-income units after the revitalization over the latter). Plaintiffs' evidence never once demonstrated how the Clinton-Peabody demolition subjected them to treatment different from any non-protected class. Therefore, this Court found no evidence of discrimination on the basis of race, sex or familial status, and resolved Counts I, II and III in favor of the SLHA, and Counts XVII & XVIII in favor of HUD.
The Court will next set out an alternative basis on which it based its legal conclusion that Plaintiffs made no showing of discrimination. While the Court stresses that it found no basis for the Plaintiffs' discrimination claims, even if the Court had accepted Dr. Fischer's conclusion that the HOPE VI plan would disparately impact African-Americans, female headed households, and large families, the next step would be to shift the burden to the Defendants to demonstrate that its Plan "is justifiable on the ground it is necessary to [each Defendant's] exercise of its funding responsibilities." Oti Kaga, 342 F.3d at 883 (describing the burden-shifting analysis employed in disparate impact cases). At trial, and in their various motions for summary judgment, Defendants set out a multiplicity of factors, policy objectives, and statutory mandates that were balanced and weighed during the design and approval process for the Plan. Plaintiffs failed to show that the Defendants could have met their various and sometimes conflicting duties while simultaneously providing the same number of low-income family public housing units under the Plan. Oti Kaga, 342 F.3d at 883 (plaintiff "may nonetheless prevail by showing another policy would accomplish [the proffered policy] objectives without the discriminatory effects."). The Court will discuss some of the most significant policy objectives served by the demolition of family public housing units coupled with the relocation of at least some of the tenants thereof, and explain why the Court found the Plaintiffs' simplistic solutions to be ineffective to balance the multiple policy objectives imposed on HUD by the HOPE VI program.
Plaintiffs' chief grievance was the number of replacement low-income family public housing units under the Plan. Plaintiffs' closing argument, Trial Transcript (Doc. No. 187), p. 51. Throughout the trial of this case, Plaintiffs urged the Court to force Defendants to increase the number of those units in the Near South Side Revitalization plan. Id. at p. 58. Assuming Plaintiffs had shown a disparate impact, what policy objectives could and did HUD and the SLHA advance to justify the Plan? To fully answer this question, some background information on the HOPE VI program and the history of the Near South Side Revitalization Project is required.
In 1994, SLHA was awarded a planning grant under the HOPE VI program. Joint Statement of Stipulated Facts ("Stip.") ¶ 5. In 1995, the SLHA applied for and received a $46.7 million grant to revitalize the Darst-Webbe Elderly and Paul Simon Elderly public housing complexes in the Near Southside area of downtown St. Louis, Missouri. Id. ¶ 14. The initial plan statement was approved by HUD on July 13, 1995. Id. Because of delays and a number of plan changes the SLHA failed to move forward on the grant, and on August 11, 1997, HUD notified the SLHA that the SLHA was in default under the grant agreement, that things had to change, and that, at a minimum, the SLHA was required to submit a default resolution plan satisfactory to HUD within 30 days. Id. ¶ 21.
To assist the SLHA in curing the default, HUD provided technical assistance to the SLHA through the services of a *960 consulting team from Abt Associates ("Abt"). Stip. ¶ 23. HUD directed the SLHA to submit a proposal to cure the grant default by April 15, 1998. The SLHA provided a draft of the Revitalization Plan Statement which served as a proposal to cure the default, and was "designed to more fully and appropriately address the [then existing] conditions in the Darst-Webbe area." SLHA Ex. C187, p. 005317. In October 1998, a final Revitalization Plan was submitted to HUD, and shortly thereafter, HUD deemed the default "cured". Stip. ¶ 47.
The Revitalization Plan calls for the construction of a community composed of three types of rental units; low-income public housing units, low-income tax credit units, and market rate rental units; along with a significant number of units for sale to owner-occupants. The low-income units have income thresholds for tenancy, and rents are set using formulas dependent on either family income or a fraction of the median area income. The market rate units are open to all tenants and rents are set at prevailing market rates for comparable units.
The Clinton-Peabody Development was originally constructed in 1942, and contained a total of 657 family residential units in 53 buildings situated on 23.2 acres immediately west of Darst-Webbe. Stip. ¶ 10. Clinton-Peabody has a documented history of criminal activity, and the layout of the site contributes markedly to that problem. SLHA Ex. C329 at p. 8855. According to one architectural expert, the Clinton-Peabody site "presents the most effective design for the promotion of criminal activity that he has ever encountered." SLHA Ex. C187, p. 05341. The Plan included "selective demolition and reconfiguration of the Clinton-Peabody site" to reduce its density and improve the layout, in part by creating additional streets and smaller blocks. Id. at p. 5319.
The Darst-Webbe development was put in service in the mid-1950s and consisted of several multi-story reinforced concrete and masonry apartment buildings. SLHA C255, p. 06617-18. All 758 family units were approved for the demolition by HUD in April 1997. Id. The primary factor in HUD's decision was the astronomical cost of renovating the Darst-Webbe units, estimated at $72,000.00 per unit. Darst-Webbe also suffered from architectural, mechanical, infrastructure and security deficiencies. Id.
In creating the Revitalization Plan, the SLHA and HUD sought to create an economically and racially mixed community; one which would remain vital and desirable for all residents, and offer commercial and social-service amenities appropriate for all residents. The overall mix of housing units throughout the Revitalization Area was a critical component of the success of the program. Several factors went into this decision-making process; (1) the findings and conclusions reached by Zimmerman/Volk Associates, Inc., regarding the pricing levels and percentage of market rate ownership and rental housing units necessary to achieve the successful redevelopment of the Near South Side Revitalization Area, as reported in their "Summary of Findings" submitted as part of the SLHA's October 1998 Revitalization Plan Statement. SLHA Ex. C255, pp. 06851-06882; (2) developments in the St. Louis home market in which "private developers have successfully built and marketed... new housing on formerly blighted sites near downtown St. Louis." Id. at 006603.(3) partnership with the City of St. Louis to create a synergistic approach to providing the Revitalization Area's new and existing residents with services including; education, social services designed *961 to bring low-income residents into a state of self-sufficiency, job training, child care, transportation and recreation; Id. at 006918(4) partnership with the Missouri Division of Family Services to provide on site services for eligible Revitalization Area residents; and, (5) partnership with the St. Louis Agency on Training and Employment to provide assessments and services to eligible Revitalization Area residents. See SLHA Ex. C255, pp. 006918-006980. The critical importance of the success of the home-ownership units to the overall revitalization plan cannot be overstated because "[h]omeowners have a powerful self-interest in maintaining and improving the quality of life in their neighborhood." SLHA Ex. C187, p. 05395.
These elements of the Revitalization Plan were responsive to the broad policy goals driving the HOPE VI program, which, at least in HUD's view are nothing less than:
... [T]he reinvention of public housing. The program is expected to produce models for ending the isolation of public housing agency, by encouraging partnerships with actors from the broader community, and [ending] the isolation of public housing developments and residents, by blending public housing units into more diverse and mixed-income communities.
HUD Ex. 000767-000771; see also 42 U.S.C. § 1437v(a)(3) (providing that one express purpose of HOPE VI is "providing housing that will avoid or decrease the concentration of very low-income families").
These policy goals can be achieved with HOPE VI funds through activities such as capital cost funding for physical construction, but the plan may also fulfill the HOPE VI goals with expenditures of federal funds on the "implementation of community service programs and supportive services". HUD Ex. 000767.
Plaintiffs were not satisfied with the policy decisions inherent in HUD's approval of the Revitalization Plan. Throughout this case Plaintiffs have sought the remedy of additional low-income family public housing units, and thus to tinker with the considered decisions made by the SLHA, and HUD. The record clearly demonstrates that those decisions were based on inter alia expert analyses of the St. Louis housing market, the physical capacities of the site's existing architecture and layout, SLHA's decades of experience in constructing and managing public housing, the existing and to be built infrastructure on the site, and the services available from state and local social service agencies. Inherent in the provisions of the Revitalization Plan are load capacities for the services associated with the low-income family public housing units at the site. For example, the Revitalization Plan includes a commitment from the Missouri Division of Family Services to provide "one experienced Case Manager, and one experienced Case Worker at the SLHA office of self-sufficiency." SLHA Ex. C255, p. 006976. The Revitalization Plan likewise calls for substantial goals such as business development training to a minimum of 20 residents annually, to provide computer access to minimum of 75 job trainees per year, to provide bus passes, bus tokens, and gasoline allowances for a minimum of 50 persons annually. Id. at 006918-006934. Finally, the Revitalization Plan's financial underpinnings are dependent on the unit mix because without a subsidy, none of the public housing rental units will break even on an operating basis, much less a capital cost financing basis. Id. at 006809. The Revitalization Plan was designed to balance a multitude of public policy considerations; some express statutory directives, others set out *962 by HUD, all of which were supported by substantial evidence.
Plaintiffs however chose to approach the matter simplistically; they simply wanted to add units to the site because "the beauty of the Hope VI project is that when you build public housing units as part of a mixed income development, you don't know where those public housing units are." Trial Transcript, Doc. No. 187, p. 124. So that if the SLHA were to add 120 more units, the public "is not going to know they are public housing, so they could be built on the site in the immediate area." Id. Plaintiffs' approach is limited to comparing the Revitalization Plan area site to the Murphy Park neighborhood, a development Plaintiffs contend is a "viable, feasible successful development with 55 percent of its units as family public housing." Id., p. 55. Merely suggesting that Murphy Park is comparable to the Near Southside Area does not make it so. The Court was unimpressed with the Plaintiffs' comparison because the Revitalization Plan Area is part of a plan designed not only around the unique physical attributes of the affected housing and the St. Louis housing market, but around the § 108 loan guarantees, the Old City Hospital phase of the development, the proximity to Soulard and Lafayette Square, the social services available and committed to the project, the available funding, the projected sustainability of the completed project and other factors. Any comparison between Murphy Park and the Revitalization Plan Area, or between any other mixed income development and the Area, are at best rough comparisons. Testimony of Richard David Baron, Trial Transcript (Doc. No. 183) pp. 47-110; 92-98 & 99-100. Although Plaintiffs focused on the possibility that additional low-income units might be added to the Revitalization Plan Area, either in lieu of or in addition to other housing, Plaintiffs have missed the point; unless some nexus is drawn between discrimination and the Plan, the unit mix is up to the agencies entrusted with creating the development. HUD and the SLHA had a series of complicated decisions to make, and while the Court has never taken lightly the impact of those decisions on the lives of the residents of the existing public housing in the Revitalization Plan Area, neither can the Court disregard the considered policy decisions of the agencies entrusted with directing the redevelopment of the Area.
The simple fact, amply demonstrated by the Plaintiffs' expert, is that anytime housing opportunities are opened up to prospective residents with a range of incomes in the St. Louis area, it is statistically likely that low-income residents will be disproportionately represented by African-Americans, members of a female headed household, and members of families with large numbers of children. Even if the Court found that statistical fact to be sufficient, in and of itself, to demonstrate a disparate impact (an illogical assertion at best), Plaintiffs have provided no evidence to show that their solution, an increase in low-income family public housing units in the Revitalization Plan Area, is feasible in light of the analyses used to determine the optimum density and mix of housing and services in the Revitalization Plan. The Court also found that Plaintiffs never sought to tie their remedy of choice, the alteration of the unit mix in the Revitalization Plan, to the harm they contend was visited upon them; instead, when Dr. Fischer was asked if the concentration of protected classes on the Near Southside would be any different if the SLHA were to add additional units to the Revitalization Plan, he simply answered: "It's not clear." Trial Transcript, Doc. No. 190, p. 40.
Therefore, the Court concludes that Plaintiffs failed, as a matter of law, to establish a prima facie case of discrimination. *963 Further, even if this Court assumed without deciding that SLHA's Revitalization Plan as approved by HUD caused a disparate impact, Plaintiffs have shown no alternative policy that would fulfill the multiple policy goals set out for the HOPE VI program and the revitalization of the Near South Side as effectively as the Plan as approved by HUD. Oti Kaga, Inc., 342 F.3d at 883.

HUD's Duty to Affirmatively Further Fair Housing
In part C(2) of its Opinion, the Eighth Circuit directed this Court to "provide a more detailed explanation for [its] conclusion that HUD appropriately considered its duty to affirmatively further fair housing." Darst-Webbe, 339 F.3d at 713. Under 42 U.S.C. § 3608(e)(5), HUD has a duty to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the Fair Housing Act]." Darst-Webbe, 339 F.3d at 713. This Court has been instructed that HUD's duty under § 3608(e)(5) includes a duty to "`consider the effect of a HUD grant on the racial and socio-economic composition of the surrounding area.'" Darst-Webbe, 339 F.3d at 713 (quoting N.A.A.C.P. v. Secretary of Housing and Urban Development, 817 F.2d 149, 156 (1st Cir.1987)). The Eighth Circuit further elaborated by explaining that "the need for such consideration itself implies, at a minimum, an obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply." Darst-Webbe, 339 F.3d at 713. § 3608(e)(5) "reflects [Congress'] desire to have HUD use its grant programs to assist in ending discrimination ... to the point where the supply of genuinely open housing increases." N.A.A.C.P., 817 F.2d at 155 (examining legislative history).
The Court notes that the administrative process followed in this case was not so readily susceptible to review as a written administrative decision such as that issued by an administrative law judge in a Social Security disability determination, or a subpoena enforcement decision from the Equal Employment Opportunity Commission. Instead, the case at bar presents the Court with thousands of pages of reports, proposals, planning documents, and letters, each of which implicate multiple policy goals and address different statutory and regulatory requirements. The Plaintiffs chose to focus on what they saw as the final product of the Revitalization Plan (the unit mix in the finished development) during the trial of this case; but a review of HUD's actions under the APA standard articulated above requires the Court to look at the regulatory process behind HUD's actions before comparing the outcome with the statutory command.
This is not a case where HUD's actions are so egregious, so inconsistent with its duty to affirmatively further fair housing, that a dereliction of that duty can be presumed. N.A.A.C.P., 817 F.2d at 159 (prescribing high scrutiny where an agency entrusted with discretion by statute has nonetheless "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities") (internal citations and quotations omitted). The Court's review is comprehensive, but in the final analysis rather narrow, calling for a straightforward evaluation of whether HUD's decision has "furthered the statutory goal". Id. at 158; see also Bankruptcy Estate of United Shipping Co., Inc. v. General Mills, Inc., 34 F.3d 1383, 1390 *964 (8th Cir.1994) (discussing deferential standard of review under the APA).
Therefore the Court undertakes to (1) examine HUD's analysis of fair housing needs in the St. Louis area to determine whether HUD took a clear look at the fair housing needs of the St. Louis community, (2) determine whether HUD took action to respond to those needs through the approval of the Near Southside Revitalization Plan while simultaneously assessing the negative impact of the Plan on the supply of genuinely open housing, and (3) to draw a legal conclusion based on those findings as to whether HUD's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law", which in this case requires HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the Fair Housing Act]." 5 U.S.C. § 706(2)(A); 42 U.S.C. § 3608(e)(5).
First, the Court finds that HUD considered the fair housing needs of the St. Louis community in making the decisions complained of by Plaintiffs. The Analysis of Impediments to Fair Housing  City of St. Louis Report[7] was part of the administrative record submitted by HUD. SLHA Ex. C570, pp. 015010-015128 ("AI Report"). The AI Report was prepared by the University of Missouri-St. Louis Public Policy Research Centers, with Community Development Block Grant funds and support from the St. Louis City and County housing agencies. Id. at p. 015013. The AI Report analyzed data from a variety of sources including interviews with housing professionals (e.g. bankers, realtors and insurers), telephone surveys of owners and renters, statistical analysis of census data, and analyses of records of fair housing actions. Id. The AI Report identified impediments to fair housing in ways designed to yield practical solutions. For example, by use of telephone survey data, the authors identified informational barriers to minority housing opportunities; that is, minority home-ownership was impeded by a lack of practical information about credit, housing opportunities, and the accessibility of home-ownership. Id. at 15034-5. The AI Report concluded that an effective action plan to further fair housing would include programs to move minority tenants into home-ownership incrementally, the provision of homes for those tenants to realistically move into, tying enhanced employment opportunities to areas where home ownership is to be encouraged and enhanced communication about the paths to home-ownership. Id. at 15064-6; see also Joan Kelly Horn, City of St. Louis Five Year Consolidated Plan Strategy: An Agenda for Community Revitalization prepared in keeping with the requirements of the U.S. Department of Housing and Urban Development, Pltf. Ex. Vol. IX, Bates No. 203217, at pp. 203305 (discussing fair housing solutions including neighborhood revitalization efforts including Darst-Webbe); Id. at pp. 203440 (discussing specific fair housing recommendations).
HUD carefully considered the AI Report in an earlier draft form when it conducted a community assessment summary in June 1996 to determine the St. Louis Area agencies' meaningful compliance with 24 C.F.R. 91.225(a)(1)[8] concluding that, *965 while the first draft of the AI Report appeared to be reasonably complete, revision was needed "to include more detailed and specific action plans to address the identified impediments" and that the AI Report should "include an analysis of any potential impact that conservation districts may have on the availability of affordable housing." HUD administrative record, pp. XXXXXX-XX
HUD approved the 1997 revisions in a June 1997 memorandum which noted that the SLHA's plan to reduce impediments to fair housing "identified funding of projects for housing rehabilitation, new construction and/or acquisition of affordable housing and tenant based assistance." HUD administrative record, p. 01531. HUD's Director of Fair Housing and Equal Opportunity approved these goals, and noted that "[s]uch programs are representative of action plans (AI) to eliminate barriers to affordable housing." Id. Less than one year later, the same HUD officer indicated that the SLHA's "activities to increase the supply of affordable rental housing and home-ownership opportunities are positive steps towards the implementation of its AI." Id., p. 015134. Later in the same document, the displacement of low-income public housing residents is noted and analyzed based on their minority status, and the minority membership of the communities into which they were resettled. Id., p. 015135. Based on the record presented to the Court, it is clear that HUD was aware of the impediments to fair housing in the St. Louis area, and had considered solutions.
The next question is whether, in light of the history of the Darst-Webbe and Clinton-Peabody sites, the administrative record in this case including the Zimmerman/Volk market analysis (cited supra), the AI Report, the annual performance evaluation reports, and the Revitalization Plan itself, HUD took appropriate action to respond to the impediments to fair housing present in the St. Louis area through the approval of the Near Southside Revitalization Plan while simultaneously assessing the negative impact of the Plan on the supply of genuinely open housing. The Court declines however to apply this test mechanistically; HUD had many other issues before it besides the fair housing impact of the Plan such as the HOPE VI goals of deconcentrating low-income public housing populations, reducing the density of existing low-income housing, and providing a community centered approach to revitalizing the Near Southside. Even so, one fact that stands out is HUD's recognition that a lack of affordable home-ownership opportunities and the lack of necessary knowledge and resources on the part of potential minority homebuyers, are two of the most serious impediments to fair housing in the St. Louis market. AI Report p. 015064; HUD Administrative Record at 05134-5 & 05137.
The Plaintiffs' position in this case, discussed more fully supra, was that the Revitalization Plan's unit mix was itself per se discriminatory, and that HUD had thus failed to affirmatively further fair housing by (1) not providing more low-income family public housing units in the Near South Side Revitalization Plan Area, and (2) consigning the displaced Darst-Webbe and *966 Clinton-Peabody residents to live in racially segregated public housing developments. The Court first reiterates that credible evidence was not adduced at trial to support the allegation that any action by HUD or the SLHA consigned residents to live in racially segregated public housing developments. To the contrary, residents of Darst-Webbe and Clinton-Peabody who remain or resettle in the Revitalization Area after the completion of the development, will have moved from what was an almost 100% African-American, 100% low-income community to what is intended to be a racially and economically diverse, safer and more resident friendly community, with a physical and social service infrastructure designed to provide its low-income residents with opportunities to obtain jobs, health care, education, transportation, family counseling and home-ownership predicates. By incorporating specific remedies to serious impediments to fair housing in the St. Louis area; e.g. by creating a supply of affordable housing stock available for purchase, and creating affordable rental housing with a complement of services and infrastructure to make home-ownership more attainable for renters, the Plan addresses several pressing deficiencies identified by the AI Report. The Plan is not designed to be a panacea for all of the problems of all of the current and future residents of the Plan Area, nor could it consistently with the HOPE VI goal of reducing housing density and creating economically diverse communities.
This Court must thus evaluate HUD's actions in considering and approving the Revitalization Plan in this case in light of the text of § 3608(e)(5) and the foregoing judicial gloss. The Court concludes that HUD took action "to fulfill, as much as possible, the goal of open integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." Otero v. New York City Housing Authority, 484 F.2d 1122, 1134 (2d Cir.1973). While this Court might have chosen different solutions such as a more aggressive low-income unit mix or a program of residential mortgage guarantees for low-income home buyers, we cannot say that HUD's actions in approving the Revitalization Plan including the HOPE VI grant and § 108 loan guarantees was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with..." administration of "the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the Fair Housing Act]." 5 U.S.C. § 706(2)(A); 42 U.S.C. § 3608(e)(5).
This case ultimately raises the issue of the purpose of public housing. HOPE VI was designed to depart from public housing programs concerned solely with providing housing for those in serious need; rather HOPE VI is an ambitious attempt to build communities that will provide opportunity for residents from a range of backgrounds. It is HUD's vision that some residents will find an immediate, open opportunity for home-ownership in a robust and diverse community where those homeowners will provide stability and a strong economic base. For other residents, HUD hopes the community will provide safe, modern and affordable housing where the fundamental predicates for success can be developed in a mainstream environment.
The Court has always respected the Plaintiffs' desire to maintain their community. That goal is not wholly incompatible with the vision inherent in the Revitalization Plan that is the subject of this case. However, the Plaintiffs' physical community at the outset of this case was a deteriorating and dangerous relic of largely failed *967 policies. HUD has a necessarily broader view of community than the Plaintiffs in this case, and it must fulfill its many (and sometimes conflicting) policy objectives through a decision making process this Court cannot challenge on a line-item basis; at least not on the record at bench. The Court concludes that while different stakeholders in this case might have different visions for public housing in general, and the Revitalization Area in particular, the Defendants' vision is neither discriminatory nor inconsistent with the furtherance of fair housing in St. Louis. As such, their other decisions are an exercise of discretion granted by Congress and outside the purview of this Court.
As the Court concludes that as Plaintiffs have not prevailed on any Counts, there is no need to consider the issue of relief. An appropriate Order will issue.

ORDER
In accordance with the Memorandum Opinion entered herein this date,
IT IS HEREBY ORDERED that this cause of action be and is DISMISSED.
NOTES
[1] Count I alleges that SLHA has made unavailable and denied housing to plaintiffs, and discriminated against plaintiffs because of race in violation of the Fair Housing Act, by developing and promulgating a new HOPE VI plan which results in the loss of 895 housing units for persons with very low income.
[2] Count II alleges that SLHA has made unavailable and denied housing to plaintiffs, and discriminated against plaintiffs because of sex in violation of the Fair Housing Act.
[3] Count III alleges that SLHA has made unavailable and denied housing to plaintiffs, and discriminated against plaintiffs because of familial status in violation of the Fair Housing Act.
[4] Count XIII alleges that HUD failed to affirmatively further fair housing in violation of 42 U.S.C. § 3608(e) by approving a Section 108 loan guarantee to assist the HOPE VI plan which discriminates against African-Americans, women and children and consigns the displaced Darst-Webbe Family Households to live in racially segregated public housing developments.
[5] Count XVII alleges that HUD violated the Administrative Procedure Act 5 U.S.C. § 701 et seq. by approving a Section 108 loan guarantee to assist the Darst-Webbe HOPE VI plan which discriminates against African-Americans, women and children and consigns the displaced Darst-Webbe Family households to live in racially segregated public housing developments.
[6] Count XVIII alleges that HUD committed the same violation as in Count XVII by approving the new Darst-Webbe HOPE VI plan which discriminates in the same manner as described in Count XVII.
[7] Aside from an assessment of the impediments to fair housing faced by members of protected classes which the Court will discuss in detail, the AI Report provided a review of fair housing law and other relevant federal legislation, as well as federal program regulations provided by the St. Louis University School of Law.
[8] This regulation requires, in pertinent part that:

(1) ... Each jurisdiction is required to submit a certification that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard.
24 C.F.R. 91.225(a)(1) (2003)