# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1673

_____

| | | |
|---|---|---|
| Oti Kaga, Inc., | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| South Dakota Housing Development | * | Appeal from the United States |
| Authority; William Earley; Darlys | * | District Court for the |
| Baum; John Rothstein; Kevin Culhane; | * | District of South Dakota. |
| Lynn Hager; Thomas Schramm; Leland | * | |
| Kleinsasser, | * | |
| | * | |
| Defendants - Appellants. | * | |
| | * | |
| ------------------------------------- | * | |
| Cheyenne River Housing Authority; | * | |
| Cheyenne River Sioux Tribe, | * | |
| | * | |
| Amicus on behalf of Appellants | * | |

_____

Submitted: December 12, 2002

Filed:  September 15, 2003

_____

Before HANSEN, Chief Judge,[1] HEANEY and BYE, Circuit Judges.

_____

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003.  He has been succeeded by the Honorable James B. Loken.

_____

BYE, Circuit Judge.

Oti Kaga appeals the district court's[2] grant of summary judgment dismissing its eleven-count complaint against the South Dakota Housing Development Authority (SDHDA) and its seven-member board. The complaint alleges SDHDA discriminated against Oti Kaga by rejecting its applications for tax credits under Internal Revenue Code (IRC) § 42, and for funding under the HOME Investment Partnership Act (HOME Program), 42 U.S.C. §§ 12741-12756. We affirm.

I

Oti Kaga is a non-profit corporation established by the Cheyenne River Sioux Tribal government pursuant to the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1437x. Oti Kaga's purpose is to acquire, construct, and operate rental housing and related facilities on the Cheyenne River Sioux Indian Reservation.

SDHDA is an independent public instrumentality exercising essential public functions under S.D. Codified Laws § 11-11-10. SDHDA is responsible for, among other things, adopting and implementing a tax credit allocation plan pursuant to IRC § 42, as well as administering the state HOME Program in South Dakota. Appellees William Earley, John Rothstein, Kevin Culhane, Lynn Hager, Thomas Schramm and Leland Kleinsasser are members of SDHDA's Board of Commissioners, and appellee Darlys Baum is SDHDA's Executive Director. Baum and the board members were sued individually and in their official capacities.

_____

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

Oti Kaga's claims arise out of SDHDA's administration of two federal housing programs. The first, the tax credit allocation program, is authorized by IRC § 42, and encourages investment in low-income housing projects. Under the tax credit allocation program, state housing agencies are responsible for allocating tax credits for the construction of low-income housing. IRC § 42(h)(3) limits the total number of housing credits a state may allocate annually, and IRC § 42(m) requires the credits to be allocated in accordance with a "qualified allocation plan." The annual plan must be prepared by the state's housing agency and approved by the governmental unit of which the agency is a part. IRC § 42(m)(1)(A)(i). SDHDA is the authorized housing agency for South Dakota. S.D. Codified Laws § 11-11-47.

The second program at issue is the HOME Program. The HOME Program provides federal housing funds directly to participating jurisdictions. The jurisdictions disburse those funds in the form of loans and grants "to provide incentives to develop and support affordable rental housing and home ownership affordability." 42 U.S.C. § 12742(a)(1). Prior to 1998, states, certain municipalities, and Indian tribes were participating jurisdictions in the HOME Program. 42 U.S.C. § 12747(a)(2). Accordingly, each Indian tribe in South Dakota could apply directly to the Department of Housing and Urban Development (HUD) for an Indian HOME Program allocation. Indian tribes could also apply to the state housing development authority for state HOME Program funds. According to HUD regulation 24 C.F.R. Part 92, "[a] State may fund projects on Indian reservations located within the State provided that the State includes Indian reservations in its consolidated plan." Because of the separate allocation existing prior to 1998, SDHDA adopted annual HOME Program Plans which included reservation demographics but precluded the use of state HOME Program funds for tribal projects.

In 1996, Congress enacted the Native American Housing and Self-Determination Act (NAHASDA), 25 U.S.C. §§ 4101-4243. In conjunction with NAHASDA, Congress terminated several programs which had provided Indian

housing assistance, including the Indian HOME Program. Thereafter, Indian housing assistance was funded directly through Indian Housing Block Grants (IHBG), 25 U.S.C. § 4111, and disbursed to recipients on the basis of Indian Housing Plans (IHP) prepared by the tribes and submitted to HUD. 25 U.S.C. § 4112. Unlike HOME Program funding, which is based on a competitive process, IHBGs are entitlement funds which tribes use to meet locally identified needs. 25 U.S.C. § 4116(b)(1).

Notwithstanding consolidation of Indian-funding programs under NAHASDA, HUD regulations implementing the HOME Program continue to allow states the discretion to fund projects on Indian reservations provided the state includes the reservations in its annual HOME Program Plan. 24 C.F.R. § 92.201. Prior to passage of NAHASDA, SDHDA chose to include reservations in its annual plan but did not award state HOME Program funds to Indian reservations or other jurisdictions receiving separate allocations of funds.[3] After NAHASDA became effective SDHDA continued this practice.

In March 1996, Oti Kaga, with the assistance of David Bland,[4] submitted an application for tax credits to SDHDA in connection with a proposed housing development (Elk View I) located on the Cheyenne River Sioux Indian Reservation. Of the twenty-three applications for tax credits received by SDHDA in 1996, four came from Indian tribes. SDHDA considered the applications and ranked them from one to twenty-three according to its tax credit allocation plan, with one being the highest rated and twenty-three the lowest rated application. Oti Kaga's application was ranked six out of twenty-three but, as with other higher ranked applications, it did not receive an award of tax credits. Only one of the tax credit awards went to an

---

[3]The sole exception to this policy was an allocation in the form of a bridge loan to the city of Sioux Falls, South Dakota, which was repaid the following year.

[4]Bland operates Housing and Community Development, Inc., and specializes in assisting Indian tribes, among others, with developing tax credit financed housing projects.

Indian sponsor. In addition to ranking criteria set out in IRC § 42(m)(1)(C)(i-viii), SDHDA considered the extent to which the sponsor of the application was ready to proceed. One member of SDHDA testified this factor weighed heavily against Oti Kaga. Another board member stated the board decided it should award one tax credit to an Indian tribe, and a lower ranked Indian-sponsored application was selected. In October 1996, Oti Kaga was subsequently awarded the tax credits after a successful applicant declined its award. Oti Kaga contends it was discriminated against because the decision to initially deny tax credits was based on race.

Oti Kaga intended to build Elk View I using tax credits and Indian Home Program funding obtained in 1996. It intended to build the second phase of the Elk View project (Elk View II) using tax credits and Indian Home Program funding awarded in 1997. Oti Kaga contends it suffered "distinct and palpable" injuries in connection with those planned projects caused by the delay in awarding tax credits in 1996. Oti Kaga alleges it was told Indian Home Program funding would not be awarded in 1996 unless tax credits were also awarded. Because it was initially denied tax credits, Oti Kaga ignored the 1996 Indian HOME Program application deadline. As a result, Elk View I was delayed until 1997 and ran into cost overruns. Oti Kaga alleges it was further harmed because it was forced to use Indian Home Program funds obtained in 1997, which had been earmarked for Elk View II, to construct the delayed Elk View I project, thereby in turn delaying Elk View II. Oti Kaga also alleges a price quote it obtained for an environmental assessment for Elk View I increased significantly from 1996 to 1997.

Oti Kaga also claims discrimination resulting from SDHDA's decision not to award state HOME Program funds in 1997. As previously noted, Oti Kaga alleges it was forced to use 1997 Indian HOME Program funds to build Elk View I. As a result, it had to seek alternative funding for Elk View II. Thus, in 1997 Oti Kaga applied to SDHDA for state HOME funding to finance Elk View II. Its application for state HOME Program funding was denied. Among the reasons given for denying

the application were SDHDA's belief that 1) housing projects on Indian reservations were provided for under NAHASDA, and 2) state HOME Program funds were no longer available for Indian projects. As with the denial of tax credits, Oti Kaga argues the decision to deny its application for state HOME Program funding was based on race. Oti Kaga contends it was harmed by the discriminatory refusal to award state HOME Program funds because the lack of funding delayed construction of Elk View II.

Oti Kaga brought suit against SDHDA and its board members claiming 1) disparate treatment under the Fair Housing Act of 1968 (FHA), 42 U.S.C. §§ 3604 & 3605; 2) disparate impact under the Fair Housing Act of 1968, 42 U.S.C. §§ 3604 & 3605; 3) violation of the right to contract, 42 U.S.C. § 1981; 4) violation of the property rights of citizens, 42 U.S.C. § 1982; 5) disparate treatment/impact under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; 6) negligent performance of statutory obligations; 7) discrimination in the allocation of HOME Program funds, 42 U.S.C. § 12832; 8) discrimination in Title VI programs (disparate treatment), 42 U.S.C. § 2000d; 9) improper allocation of tax credits, IRC § 42(m); 10) state Fair Housing Act violation, S.D. Codified Laws Ch. 20-13; and 11) deprivation of rights under color of law, 42 U.S.C. § 1983. Appellees moved for summary judgment on the basis of standing, political question doctrine, mootness, qualified immunity, the inability of a corporation to recover damages for personal injury, statute of limitations, the inability to prove intentional discrimination, a failure to exhaust state administrative remedies, and failure to join indispensable parties. The district court granted summary judgment finding Oti Kaga lacked standing to bring any claims arising from the denial of its application for tax credits because it sustained no injury and, alternatively, the claims were barred by expiration of the statute of limitations. The district court also dismissed Oti Kaga's claims arising out of the denial of its application for state HOME Program funding, finding Oti Kaga could not make out a prima facie showing of intentional discrimination or disparate impact. Oti Kaga, Inc. v. S.D. Housing Dev. Auth., 188 F.Supp.2d 1148, 1160-68 (D.S.D. 2002).

## II

We review a grant of summary judgment de novo, applying the same standard as the district court. Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Summary judgment is proper if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When ruling on a summary judgment motion, a court must view the evidence "in the light most favorable to the nonmoving party." Dush v. Appleton Elec. Co., 124 F.3d 957, 962-63 (8th Cir. 1997). However, a "nonmovant must present more than a scintilla of evidence  and  must advance specific facts to create a genuine issue of material fact for trial." F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir. 1997).

### A.      Standing to assert denial of tax credits

The district court granted summary judgment and dismissed Oti Kaga's claims arising from denial of tax credits finding it failed to allege any injury in fact. We review the district court's grant of summary judgment based on standing de novo. National Fed'n of the Blind of Mo. v. Cross, 18 F.3d 973, 979 (8th Cir. 1999).

"The question of standing 'involves . . . constitutional limitations on federal-court jurisdiction.'" Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

> To satisfy the case or controversy requirement of Article III, which is the irreducible constitutional minimum of standing, a plaintiff must, generally speaking, demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

Id. (internal quotations omitted).

Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Traceability requires proof of causation, showing the injury resulted from the actions of the defendant "and not . . . [from] the independent action of some third party not before the court." Id. (internal citations and quotations omitted). "As the non-moving party facing a summary judgment motion, it was [Oti Kaga's] burden to present some evidence to establish a genuine question of fact on the standing issues of injury and causation." Eddings v. City of Hot Springs, 323 F.3d 596, 602 (8th Cir. 2003) (citing Fed. R. Civ. P. 56(e)). Our inquiry into standing, however, is not a review of the merits of Oti Kaga's claims. Campbell v. Minneapolis Pub. Housing Auth., 168 F.3d 1069, 1073 (8th Cir. 1999). Instead, at the summary judgment stage we accept as true all material facts alleged as "long as they are not incapable of proof at trial." National Fed'n of the Blind of Mo., 184 F.3d at 979 (citation omitted).

Oti Kaga claims the delay in awarding tax credits caused it to forego applying for Indian HOME Program funding in 1996, thereby delaying Elk View I and resulting in cost overruns. Oti Kaga further claims it was harmed by having to use 1997 Indian HOME Program funds to construct the 1996 Elk View I project, leaving it without a funding source for the 1997 Elk View II project. Finally, it contends the delay in construction caused the cost of an environmental assessment to increase.

We conclude Oti Kaga has alleged sufficient injury in fact, traceable to appellees, to satisfy the requirements of standing. We question Oti Kaga's ability to prove its damages claims given its decision to ignore the application deadline, but we find the allegations are not incapable of proof. Oti Kaga alleges it was improperly denied tax credits. It further alleges the receipt of Indian HOME Program funding was dependent upon an award of tax credits, and even if it had applied for funding it would have been denied. The fact it was awarded Indian HOME Program funding for Elk View I in 1997, after receiving the award of tax credits, provides support for its allegations. Accordingly, we find Oti Kaga has alleged sufficient facts showing

it was injured by the wrongful denial of tax credits to meet the injury in fact and causation requirements of standing.[5]

## B.  Statute of limitations

Alternatively, the district court held Oti Kaga's claims relating to denial of the tax credits were barred by the applicable statute of limitations. We agree.

The district court, citing Wilson v. Garcia, 471 U.S. 261, 266 (1985), concluded South Dakota's three-year statutes of limitations governing personal injury actions, S.D. Codified Laws § 15-2-14, and civil rights actions, S.D. Codified Laws § 15-2-15.2, governed all of Oti Kaga's claims arising from denial of the tax credits. Oti Kaga did not dispute the applicability of these statutes. Instead, it argued the claims were not barred because SDHDA's actions constituted an ongoing tort, thereby tolling the limitations period. The district court disagreed, finding the alleged discriminatory conduct ended in October 1996 when the tax credits were awarded. The district court concluded Oti Kaga's period for bringing claims based on the denial of tax credits expired in October 1999, and Oti Kaga did not file suit until February 2000, approximately four months after the statute of limitations expired.

On appeal, Oti Kaga abandons its earlier position and argues a different statute of limitations applies. It now contends the district court erred in applying the three-year limitations periods set out in §§ 15-2-14 and 15-2-15.2. Oti Kaga now agues the appropriate statute of limitations is the two-year limitations period found in 42 U.S.C. § 3613(a)(1)(A). Oti Kaga further argues the two-year limitations period was tolled, in accordance with 42 U.S.C. § 3613(a)(B), during the pendency of its fair housing complaint. The record shows Oti Kaga filed a fair housing complaint following

---

[5]The district court's contrary holding appears in part driven by difficulties it encountered in deciphering Oti Kaga's damages allegations. We share the district court's sentiments.

denial of its application for tax credits and the complaint remained pending from October 1996 through September 1998. If this 23-month period is taken into account, Oti Kaga's complaint was timely.

Appellees argue Oti Kaga is precluded from presenting this new argument on appeal. Daisy Mfg. v. NCR Corp., 29 F.3d 389, 395 (8th Cir. 1994) (holding absent exceptional circumstances this court will not ordinarily consider arguments raised for the first time on appeal). Oti Kaga contends its argument is not new because its complaint alleges the facts necessary to establish the applicability of § 3613(a)(B)'s tolling provision, and characterizes its argument as "new authority" rather than a new claim. We disagree. Oti Kaga is not simply advancing additional authority on appeal to support an argument it articulated in the district court. Rather, it has abandoned its earlier position in favor of a new argument; one the district court had no opportunity to consider. In Renfro v. Swift Eckrich, Inc., 53 F.3d 1460, 1464 (8th Cir. 1995), we refused to consider, absent exceptional circumstances, an argument that a three-year statute of limitations applied when the party had argued in the district court a four-year statute of limitations applied. Here we find no exceptional circumstances warranting a different result. Accordingly, we affirm the district court's grant of summary judgment dismissing all of Oti Kaga's claims premised on the denial of tax credits.[6]

---

[6]Because we decline to consider the two-year statute of limitations argument, we reserve for another day the question of whether the tolling provision in § 3613(a)(B) applies.

-10-

C.    Denial of HOME Program funding

Next, Oti Kaga alleges several causes of action arising out of SDHDA's denial of state HOME Program funds in 1997. We consider each of these claims in turn.[7]

1.    Fair Housing Act claims

Oti Kaga alleges disparate treatment and disparate impact resulting from SDHDA's refusal to grant state HOME Program funding in 1997, in violation of the FHA, 42 U.S.C. §§ 3604 and 3605. The district court, relying on Village of Arlington Heights v. Metro. Housing Dev. Co., 429 U.S. 252, 263 (1977), dismissed Oti Kaga's claims finding Oti Kaga, as a corporation, has no racial identity and cannot establish its membership in a protected class. See Oti Kaga, 188 F.Supp.2d at 1162 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)). The district court noted several appellate court decisions characterizing the language in Arlington Heights as dictum, but nevertheless concluded "[b]ecause the Supreme Court has yet to speak again on the issue and because there is no guidance on the topic from the United States Court of Appeals for the Eighth Circuit, this court will adhere to it." Oti Kaga, 188 F.Supp.2d at 1162 n.10.

The district court was correct - we have yet to decide whether a corporation can have a racial identity. We conclude, however, that Oti Kaga's presumed lack of racial identity is not dispositive of its claims. Rather, we characterize the issue as one of prudential standing, and focus our analysis on whether Oti Kaga has standing to pursue its claims premised upon discrimination directed towards unnamed third-parties.

_____

[7]The district court determined Oti Kaga had alleged sufficient injury in fact related to the denial of state HOME Program funding to meet the requirements of Article III standing. Appellees concede this point on appeal.

In addition to Article III standing, we must consider judicially imposed prudential limits on standing. Bennett v. Spear, 520 U.S. 154, 162 (1997). By imposing prudential limits on standing, "the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to litigants best suited to assert a particular claim." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100 (1979). Accordingly, a plaintiff may have Article III standing but the claimed injury may run afoul of prudential standing because its effects are indistinct from those felt by persons generally, thus depriving the plaintiff of a unique stake in the controversy. See Warth v. Seldin, 422 U.S. 490, 499 (1975). A plaintiff may also run afoul of prudential standing limits because the claim rests on the legal rights of third-parties, Warth, 422 U.S. at 499, or the interest, though real, may not fall within the zone of interests protected by the statutory provision invoked, Bennett, 520 U.S. at 162. Here, Oti Kaga has alleged an injury resulting from the alleged discrimination which is distinct and unique. Further, the discrimination alleged falls squarely within the zone of interests protected by the statutory provisions it invokes. Thus, we focus our inquiry on whether Oti Kaga may rest its claims on the legal rights of unnamed third-parties.

Despite prudential limits on standing,

Congress can extend standing to the outermost limits of Article III. For example, it may permit an individual who suffers an injury-in-fact to bring suit for a statutory violation even if one normally would not think of that person as an intended beneficiary of the statute; or it can permit someone to seek relief based on the legal rights of individuals other than himself.

Kyles v. J.K. Guardian Sec. Servs., Inc., 222 F.3d 289, 294 (7th Cir. 2000) (citing Warth, 422 U.S. at 500-01) (additional citation omitted).

Congress may also "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." Id. (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973)). In such instances, prudential standing concerns "may not close the doors to the courthouse . . . ." Id. (citing Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997); Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982)). Thus, while in the ordinary case a party is denied standing to assert the rights of a third-person, Warth, 422 U.S. at 499, "Congress intended standing under [the Fair Housing Act] to extend to the full limits of Art. III." Gladstone, 441 U.S. at 103.

Oti Kaga argues it has standing under our holding in Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1214 (8th Cir. 1972). In Park View Heights, we held a corporate plaintiff, whose rights were "intimately close" to the rights of named individual plaintiffs, could assert the rights of the individual plaintiffs who had standing to sue in their own right, and thereby establish prudential standing. Id. Here, however, there are no named individual plaintiffs. Cf. Arlington Heights, 429 U.S. at 264 (holding it was unnecessary to decide whether corporate defendant could establish standing by asserting the constitutional rights of unnamed prospective minority tenants, because an individual named plaintiff had demonstrated standing to assert those rights on his own). Thus, Park View Heights does not answer the specific question we now face. Instead, we must decide whether Oti Kaga can establish prudential standing by asserting the rights of third-parties who have not been named as plaintiffs in this action. We conclude it may.

The test for prudential standing "is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Warth, 422 U.S. at 500. The Supreme Court has held a party need not be a member of a protected class to suffer harm from discrimination. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969). In Sullivan, a white homeowner and member of the Little Hunting Park (a non-stock corporation that operated a playground and park in the neighborhood)

-13-

rented a home to a black person. The homeowner attempted to transfer his share of the park and playground to the tenant but the Park refused to approve the assignment because the tenant was black. The Supreme Court held the homeowner had standing to bring a § 1982 action because he had been "punished for trying to vindicate the rights of minorities protected by § 1982." Id. The Court recognized the need to find standing in such instances, because the "white owner is at times the only effective adversary of the unlawful restrictive covenant." Id. (internal quotation and citation omitted). The majority relied on Barrows v. Jackson, 346 U.S. 249, 257 (1953), in which a defendant was allowed to invoke the Fourteenth Amendment to defend against the enforcement of a racially restrictive covenant without identifying any specific person who belonged to a protected group. The Court found standing because "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court" and the defendant was "the only effective adversary." Id. at 257, 259. These cases aptly illustrate the need to construe prudential standing broadly to vindicate the rights of citizens trammeled by illegal discrimination.

We also find the holding in Hudson Valley Freedom Theater, Inc. v. Heimback, 671 F.2d 702, 705-07 (2d Cir. 1982), useful to our discussion. The sole plaintiff in Hudson was a non-profit corporation organized to produce theatrical and artistic productions intended to benefit, in particular, the Black and Hispanic communities. Id. at 703. The corporate plaintiff brought suit against the county and various individuals claiming race discrimination after its application for government funding was denied. Id. The district court dismissed plaintiff's complaint for lack of standing, holding a corporation has no racial identity and cannot be the target of racial discrimination. Id. at 704. On appeal, the Second Circuit reversed, holding,

> When a corporation meets the constitutional test of standing . . . prudential considerations should not prohibit its asserting that defendants, on racial grounds, are frustrating specific acts of the sort which the corporation was founded to accomplish. Such recognition is supported by the indication in Duke Power Co. v. Carolina

-14-

Environmental Study Group, Inc., 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), that one of the reasons for prudential limitations on standing is to obtain "the assurance that the most effective advocate of the rights at issue is present to champion them."

Id. at 706.

The Hudson court concluded the corporate plaintiff was in the best position to challenge the alleged discriminatory practice because the denial of funding affected it directly. Conversely, an individual plaintiff would have to be a "resident who would have to allege an interest in attending as yet unannounced productions, or a prospective employee who might be only one of many that would seek to apply for positions not yet offered as a result of [the] denial of the grant." Id. See also Gersman v. Group Health Assoc., Inc., 931 F.2d 1565, 1569 (D.C. Cir. 1991) (finding a corporation had standing to assert a claim for injury resulting from discrimination directed at a third-party even if the corporation was not incorporated for the express purpose of furthering minority interests).

The reasoning advanced in Hudson applies equally to Oti Kaga. Oti Kaga was created to acquire, construct, and operate rental housing and related facilities on the Cheyenne River Sioux Indian Reservation. The alleged discrimination has directly affected Oti Kaga's economic interests and its ability to realize its corporate purpose. As such, Oti Kaga is a logical and more effective adversary to combat the alleged discrimination than an individual plaintiff alleging an inchoate interest in the Elk View developments. Further, permitting Oti Kaga to prosecute the discrimination claims will effectuate the purpose of the Fair Housing Act's anti-discrimination provisions and recognize Congress's intent "under [the Fair Housing Act] to extend [standing] to the full limits of Art. III." Gladstone, 441 U.S. at 103 n.9. Accordingly, we conclude Oti Kaga has standing to proceed with its claims.

### a.   Disparate treatment

Having determined Oti Kaga has standing to assert its claims of race discrimination under the FHA, we must now decide whether Oti Kaga has made out a prima facie case of discrimination.

To establish a prima facie case of discrimination, Oti Kaga must show 1) it is within the protected class, 2) it was qualified to receive funding, 3) its application for funding was rejected, and 4) SDHDA awarded funding to non-members of the class with similar qualifications.  Rowe v. Union Planters Bank of S.E. Mo., 289 F.3d 533, 535 (8th Cir. 2002).  Implicit in the fourth element is the requirement that the non-members be similarly situated.  Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999).

We conclude Oti Kaga has failed to satisfy the fourth prima facie element of its disparate treatment claim.  The only evidence presented by Oti Kaga in support of the fourth prima facie element is a single award of state HOME Program funds to the city of Sioux Falls - a jurisdiction which receives HOME Program funding directly from HUD.  Oti Kaga contends it was similarly situated because it too was eligible to receive HOME Program funding directly from HUD but was denied an award on that basis.  The record, however, indicates the state HOME Program funding awarded to Sioux Falls was actually a short-term loan made to Sioux Falls while it awaited receipt of its direct HOME Program funds from HUD.  Once those funds were received, Sioux Falls repaid the loan to SDHDA.  In other words, the "funding" awarded to Sioux Falls was not similar to the loan or grant sought by Oti Kaga to finance its Elk View development.  The Sioux Falls loan did not ultimately deplete the state HOME Program dollars available to SDHDA for distribution.  Because Oti Kaga was not seeking a short-term loan to cover the Elk View developments while it awaited receipt of Indian HOME Program funds, we find Oti Kaga and Sioux Falls were not similarly situated.  Accordingly, Oti Kaga has failed to make a prima facie showing of discrimination.

-16-

b.    Disparate impact

Oti Kaga next alleges disparate impact under the FHA.    To prove discrimination under a disparate impact analysis Oti Kaga must show a facially neutral policy has a significant adverse impact on members of a protected minority group. Chambers v. Omaha Girls Club, Inc., 834 F.2d 697, 700 (8th Cir. 1987).  The burden then shifts to SDHDA to show the policy has a manifest relationship to the allocation of state HOME Program funds and is justifiable on the ground it is necessary to SDHDA's exercise of its funding responsibilities.  Id. at 700-01.  If SDHDA is able to show the policy is justified, Oti Kaga may nonetheless prevail by showing another policy would accomplish SDHDA's objectives without the discriminatory effects.  Id.

SDHDA has adopted a policy, in accordance with the grant of discretion contained in 24 C.F.R. § 92.201(b)(5), of refusing to award state HOME Program funds to jurisdictions receiving direct HOME Program funding from HUD.[8] Oti Kaga argues the policy has a disproportionate effect on projects benefitting Indian tribes. We assume, without deciding, that Oti Kaga's allegations are sufficient to state a prima facie claim of disparate impact.  SDHDA counters by arguing its decision to award state HOME Program funds to projects which cannot otherwise access HOME Program funding is a reasonable exercise of the discretion it has been granted, and is necessary in order to best allocate the limited funds for which it is responsible.  In response, Oti Kaga fails to articulate any alternative policy which would meet SDHDA's needs as effectively without the alleged discriminatory effects.  Instead, Oti Kaga argues § 92.201(b)(5) has been the subject of debate in Congress and has been criticized by some members of Congress who believe allocation of HOME Program funds is discriminatory.

---

[8]Oti Kaga also argues the "readiness to proceed" criterion used in awarding tax credits disproportionately impacts Indian tribes.  Because claims arising out of the denial of the tax credits are barred by the statute of limitations, we need not address this claim.

We recognize there may be divergent views about whether a state should include demographics in its annual HOME Program Plan from jurisdictions that receive direct HOME Program funding, and then deny those same jurisdictions funding. Nevertheless, SDHDA is charged with the responsibility of distributing a finite number of state HOME Program dollars among competing interests. In discharging those responsibilities, SDHDA has chosen to deny HOME Program funding to *any* jurisdiction which may apply for HOME Program funding directly from HUD. We find that exercise of discretion reasonable and necessary to accomplish the daunting task SDHDA faces. Moreover, Oti Kaga has failed to offer any alternative policy which would meet SDHDA's needs as effectively. Accordingly, we affirm the district court's dismissal of Ot Kaga's disparate impact claim.

### 2. Remaining claims

On appeal, Oti Kaga has abandoned those claims set forth in Counts V, VI, IX and X of its complaint. As to the remaining claims set forth in Counts III, IV, VII, VIII and XI of Oti Kaga's complaint, we find the claims were properly dismissed and affirm the district court under 8th Cir. R. 47B.

### III

The district court's grant of summary judgment is affirmed.

HANSEN, Circuit Judge, concurring.

I would not reach the prudential standing question resolved by the court in part I.C.1. of the opinion. It is unnecessary to decide this issue because, even assuming arguendo that Oti Kaga has prudential standing, we all agree that it has failed to show disparate treatment or disparate impact in its Fair Housing Act claims. The question

whether a corporation may assert claims belonging to non-party individuals is an important one, and in my view, it would be more prudent for us to wait to answer that question until we are faced with a case in which the answer is necessary to the disposition of the case.

I join the opinion in all other respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-19-