336 F.Supp.2d 934 (2004)
Timothy OWENS, Priscilla Johnson, Essie McCatrey, and Housing Comes First, Plaintiffs,
v.
CHARLESTON HOUSING AUTHORITY, Paul Page, Department of Housing and Urban Development, Mel Martinez, United States Department of Agriculture, and Ann M. Veneman, Defendants.
No. 1:01 CV 70 CDP.
United States District Court, E.D. Missouri, Southeastern Division.
March 11, 2004.
Order Amending Judgment in Part June 23, 2004.
*935 *936 *937 *938 Ann B. Lever, Legal Services of Eastern Missouri, Daniel E. Claggett, St. Louis, MO, for Plaintiffs.
John L. Oliver, Jr., Oliver and Oliver, Michael A. Price, Office of U.S. Attorney, Cape Girardeau, MO, Raymond W. Gruender, III, U.S. Attorney Office in care of James Martin, St. Louis, MO, for Defendants.

MEMORANDUM OPINION
PERRY, District Judge.
This consolidated action is before me for decision following a bench trial. The disputes arise out of the plan by the Charleston Housing Authority (CHA) to demolish the Charleston Apartments, a low-income apartment complex in Charleston, Missouri, that has been funded by various federal programs. In the Hines[1] action the plaintiffs raise claims against CHA, the United States Department of Housing and Urban Development (HUD), and the United States Department of Agriculture (USDA). In the USDA action,[2] CHA seeks to require the USDA to accept its final payment on the promissory note and mark the note paid, and it seeks quiet title to the Charleston Apartments.
I previously granted summary judgment to CHA on Counts I and II of the Hines' plaintiff's complaint, and I granted summary judgment to the USDA on all claims brought by both the CHA and the Hines plaintiffs against it. Following the bench trial, the plaintiffs and the USDA entered into a stipulation for entry of judgment regarding Count XIII of the Hines complaint.
Counts III through XII of the Hines action remain pending for decision following the bench trial. Counts XI and XII are brought against HUD. The other counts are brought against CHA. The parties have submitted extensive post-trial briefs. Having fully considered all the evidence and arguments presented, I conclude that plaintiffs have shown that CHA's plan to demolish the Charleston Apartments has a disparate impact on African Americans and therefore violated the Fair Housing Act. This decision also violated CHA's duty to affirmatively further fair housing under the Quality Housing and Work Responsibility Act (QHWRA), 42 U.S.C. § 1437c-1(d)(15). Plaintiffs are entitled to judgment against CHA on these claims, contained in Counts X and XI of their Third Amended Complaint. Plaintiffs have not shown that they are entitled to relief on their other claims, including their claims against HUD.
In accordance with my prior summary judgment ruling, I will also enter judgment in favor of the USDA on all of CHA's claims against it.

I. FINDINGS OF FACT

Housing Comes First is a nonprofit corporation whose mission includes the preservation of affordable housing for low-income families in Missouri. Essie McCatrey and Timothy Owens are African-American residents of the Charleston Apartments. Priscilla Johnson is an African American who voluntarily moved from the complex in July 2002.
The Charleston Apartments are owned and operated by defendant Charleston Housing Authority, a public housing agency, under two federal programs. Defendant Paul Page is the executive director of Charleston Housing Authority and is sued in his official capacity.
*939 Defendant Department of Housing and Urban Development administers the housing authority's project-based rent subsidy program. Mel Martinez is the Secretary of HUD and is sued in his official capacity.
Defendant U.S. Department of Agriculture, through its Rural Housing Services Division, administers the project mortgage financing program for CHA. Ann Veneman is sued in her official capacity as Secretary of USDA.
The Charleston Apartments were built in the early 1970s and consist of 50 rental units in twenty-two buildings located near to one another in Charleston, Missouri. CHA purchased the complex in 1981 and converted the apartments to an FmHA-mortgaged § 8 Project-Based Substantial Rehabilitation project. This transaction is reflected in a Loan Resolution, Promissory Note, and Deed of Trust. Pursuant to these documents, the government, through the Farmer's Home Administration, loaned CHA $740,000 under the § 515 Rural Rental Housing Program. The Rural Housing Services, an agency of the USDA, administers FmHA loans such as the one made to the housing authority.
The Promissory Note was for a term of fifty years, with the final payment due in 2031. The Note states that "prepayments of scheduled installments or any portion thereof may be made at any time at the option of the borrower." It also states that "refunds and extra payments as defined in the regulations (7 CFR 1861.2) of the Farmer's Home Administration according to the source of funds involved, shall, after repayment of interest be applied to the installment last to become due under this note and shall not affect the obligation of the borrower to pay the remaining installments as scheduled therein." It also states: "This note shall be subject to the present regulations of the Farmer's Home Administration and to its future regulations not inconsistent with the expressed provisions hereof."
The Deed of Trust and Loan Resolution obligate the borrower to comply with all applicable federal laws and regulations.
In addition to the above documents, CHA also entered into a twenty-year Housing Assistance Payments (HAP) contract with HUD to obtain project-based § 8 assistance for the project. In the HAP contract CHA agreed not to terminate any tenancy or assistance except in accordance with HUD regulations and other federal, state and local law. The HAP contract also obligated CHA to maintain the units. The HAP contract expired by its own terms on April 20, 2001.
The Promissory Note called for 588 payments in the amount of $5624, with the first payment due April 27, 1982, and the last in 2031. Before the first payment was due, however, CHA returned or refunded $109,903.71 to FmHA, representing a portion of the loan proceeds that was not used in the purchase transaction. On other occasions it also made payments in excess of the amounts called for by the loan.
On or before July 12, 1999, CHA contacted the USDA about payment of the balance of the § 515 loan, which by this time was less than $50,000, because of the earlier refund and payments in excess of the amounts required. In November of 1999 CHA adopted a de-concentration policy, and in December it decided not to rent units in Charleston Apartments as they became vacant.
On February 14, 2000, CHA adopted Resolution 604, which resolved to pay off the loan agreement, not seek renewal of the HAP contract and demolish the Charleston Apartments. CHA adopted resolution 604 at the urging of the City of Charleston and representatives of the Charleston Police Department. These city *940 officials believed that crime in the area was attributable to the apartments. CHA stated its reasons for wanting to demolish the apartments were: (1) high density of public housing, (2) a history of drug activity and violent crime, and (3) limited funding available to improve the apartments. Plaintiffs have shown that all three of these asserted reasons were false.
First, the density figures that CHA relied on did not relate specifically to the project. The letter claimed that there were 170 public housing units in a four-block area, but this was not true. The four-block area referred to did include thirty-nine of the Charleston Housing units as well as seventy units of public housing that are near to it. But the remaining 61 units were well outside the referenced four-block area. Moreover, the Housing Authority did not attempt to quantify or even articulate any detrimental effects from this supposed "high density." In fact, when the area is evaluated under HUD's own "deconcentration" policies, the density is well within the acceptable range. For concentrations of public housing such as this, HUD does not require any special efforts to attempt to retain or attract moderate-income tenants  actions that would be required if low-income housing was too concentrated under HUD rules.
The second stated reason  drugs and violence  was also not supported by any evidence. The evidence showed that the Housing Authority has had a one strike policy for a number of years, that it has the right to evict and/or refuse to rent to people involved in criminal activity, and that it can ban people it considers troublemakers. CHA has rigorously enforced these measures. CHA has also benefited from various crime reduction programs such as weed and seed and community policing. The evidence showed that CHA had taken numerous effective measures to control crime and drug trafficking in the Charleston Apartments. The statistical evidence did not support CHA's assertion that crime was a particular problem at the apartments.
The third reason  lack of funding to make improvements  was also shown to be false. CHA's own financial records showed that the apartments were financially stable and that CHA had untapped resources available for improvement of the properties. CHA paid down the loan of the properties early, which is inconsistent with its claim of lack of resources. Plaintiffs presented substantial evidence that there were several federal programs available to CHA which it never investigated.
At the time that CHA adopted Resolution 604, 47 units were occupied. CHA has not rented any vacated or vacant apartments since the adoption of Resolution 604. During the period after the adoption of Resolution 604, CHA offered public housing units in its public housing projects to all tenants of the Charleston Apartments and gave them preference over others on the waiting list. For those former tenants of Charleston Apartments who moved out, CHA provided a moving subsidy of $150 based upon its survey of the costs of moving and re-establishing utilities. At the time of trial, only two units remain occupied.
Between February and April of 2000, Page met with HUD about CHA's decision to opt out of the HAP contract and to demolish Charleston Apartments. CHA formally advised HUD on April 24, 2000, of its decision not to renew the HAP contract, effective April 26, 2001. CHA included with this notification a copy of its one-year notice to the residents of Charleston Apartments dated April 20, 2000, which advised them of the decision to terminate the HAP contract and stated:
Since we do not intend to renew this project-based contract upon its expiration, *941 it is our understanding that, subject to availability of appropriations, [HUD] will provide tenant-based rental assistance to all eligible residents currently residing in a Section 8 project-based assisted unit. This tenant-based assistance will enable eligible residents to choose the place they wish to rent, which is not likely to include the dwelling unit in which they currently reside... Please remember that rental assistance will continue to be provided on your behalf for one year. In addition, if Congress makes funds available, we may agree to a renewal of the contract with HUD, thus avoiding contract termination all together. However, the [Board] has resolved to opt out of the HUD Section 8 contract, vacate the project and demolish it...."
(emphasis added). Although 42 U.S.C. § 1437f(c)(8) required CHA to tell the residents that it was "likely" that they would be able to remain at Charleston Apartments after the HAP contract expired, Page testified that he modified the statutory language to say that it was "not likely" because CHA did not want to mislead the residents about its plans to demolish the complex. HUD had reviewed this language earlier and had orally advised CHA that it was consistent with notification requirements.[3]
As of April 2000, the unpaid principal balance on the loan was only $112.36. Payment of the April 27, 2000 installment would have paid the loan in full.
By letter dated December 1, 2000, CHA filed a prepayment request with the USDA to comply with the requirements of ELIHPA. CHA claims in this litigation that it did so only because in 1999 the USDA had "erroneously" told CHA that it must comply with the ELIHPA prepayment procedures. The USDA subsequently notified each tenant of Charleston Apartments of the request for prepayment. On April 18, 2001, USDA informed CHA that it would need additional information to process the prepayment request. CHA did not furnish the information. On May 7, 2001, CHA tendered a check to USDA in the amount of $126.14, which would have paid the loan in full. USDA returned the check and has not accepted any payments from CHA since that time. On June 22, 2001, USDA informed CHA of its determination that prepayment of the loan would have an impact on minorities. Under ELIHPA, CHA would therefore be required to advertise the project for sale to non-profits based upon this determination. On June 27, 2001, CHA notified USDA that it was withdrawing its "erroneous request" to prepay. CHA did not appeal the June 22, 2001 determination. Therefore, there is currently no request for prepayment pending before the USDA.
At its Board Meeting on June 11, 2001, CHA adopted Resolution 639, which revoked and rescinded Resolution 604.

II. CONCLUSIONS OF LAW

The legal conclusions set out in my order granting partial summary judgment, dated May 5, 2003, are incorporated herein, and are not changed. I will briefly repeat some of those conclusions here for the purpose of context.
The loan at issue here was issued under § 515 of the Fair Housing Act of 1949, 42 U.S.C. § 1485, which authorizes loans to public, private and non-profit borrowers for the purpose of providing low or moderate income housing. In exchange for long-term *942 loans, borrowers must "[a]gree to comply with all FmHA requirements .... and ... regulations" and be "willing to honor the long term commitment associated with receipt of a Section 515 loan." 7 C.F.R. §§ 1944.211(a)(8) and (a)(14). The note gives CHA an unequivocal right to prepay and also provides that the prepayments do not obviate CHA's obligation to make each separate installment payment when due.
ELIHPA, the Emergency Low Income Housing Preservation Act, 42 U.S.C. § 1472(c), applies to this loan. ELIHPA was enacted to preserve the availability of low-income housing by restricting a project owner's ability to prepay a § 515 loan. A borrower under the rural rental housing program may request to prepay its mortgage loan in less than 50 years. All requests to prepay such mortgage loans must be processed by the USDA pursuant to ELIHPA. The project owner must submit a pre-payment request to the USDA, which cannot approve it until certain statutory requirements have been met. First, the USDA must determine whether the project is needed for low-income housing and whether the prepayment will have a material effect on minority housing needs. See 42 U.S.C. §§ 1472(c)(1)(A) and (5)(G)(ii). Here USDA found both that the project was needed and that its demolition would have an adverse effect on minorities. This means that CHA could not prepay the loan unless it first offers  for 180 days  to sell the project to qualified nonprofit and public entities or enters into a restrictive-use agreement. See 42 U.S.C. § 1472(c)(5)(A). As set forth in the summary judgment ruling, because ELIHPA applies, CHA's refusal to attempt to sell the property or otherwise comply with the regulations violates ELIHPA.
However, despite my conclusion that ELIHPA applied and that CHA had violated it, I found that the plaintiffs did not have a right to enforce its provisions, nor did they have the right to enforce the implied "rent up" provisions of the § 515 loan. CHA was entitled to summary judgment on the plaintiffs' claims even though the undisputed evidence showed that CHA had violated its obligations under the federal law and the contract.
A. Fair Housing Act Claims (Count X against CHA and Count XI against HUD) and the claim against CHA under the Quality Housing and Work Responsibility Act of 1998, 42 U.S.C. § 1437c-1(d)(15) (Count IX)
The Fair Housing Act, 42 U.S.C. § 3604(a) makes it unlawful to deny housing on behalf of race or color, among other things. Plaintiffs contend that CHA violated the Fair Housing Act because the decision to vacate and demolish the Charleston Apartment has a disparate impact on African Americans. I conclude that plaintiffs have sustained their burden on proof on this issue, and that CHA has violated the Fair Housing Act.
To prevail on this issue, plaintiffs "need prove no more than that the conduct of the defendant actually or predictably results in discrimination; in other words, that it has a discriminatory effect." United States v. City of Black Jack, 508 F.2d 1179, 1184 (8th Cir.1974). The Eighth Circuit Court of Appeals applies the three-part burden shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to evaluate racial discrimination claims under the Fair Housing Act. United States v. Badgett, 976 F.2d 1176, 1178 (8th Cir.1992).
To establish a prima facie case of disparate impact discrimination under the Fair Housing Act, plaintiffs "must show a facially neutral policy has a significant adverse *943 impact on members of a protected minority group." Oti Kaga, Inc. v. South Dakota Housing Development Authority, 342 F.3d 871, 883 (8th Cir.2003). Once plaintiffs make their prima facie case, the burden then shifts to CHA to show that its racially discriminatory policy is justified by a legitimate and substantial goal. See id.
Plaintiffs proved a prima facie case of disparate impact on African Americans. The undisputed evidence shows that Mississippi County is a very poor area with a high need for low-income housing, and that African Americans represent a disproportionate number of low-income residents in need of low-income housing. Plaintiffs' expert witness provided credible evidence showing that the loss of the Charleston Apartments would have a disproportionate impact both on African Americans in general and on low-income African Americans in particular. Plaintiffs easily met the burden of showing a prima facie case of disparate impact.
The burden then shifts to CHA to demonstrate that its decision is justified by a legitimate and substantial goal. This it has not done. Because CHA was prohibited from prepaying its loan agreement without complying with ELIHPA, it cannot justify its decision as the legitimate exercise of contractual rights. Moreover, CHA's proffered reasons for its decision to demolish the apartments were shown to be false and therefore, do not advance a legitimate and substantial goal either. As set forth in the facts section above, CHA's purported claims that the apartments contributed to too much density of low income housing in a small area and too much drug trafficking and other crimes were not true, nor was CHA's claim that it lacked the financial resources to maintain and operate the apartments. The evidence shows, in fact, that CHA did little or nothing to investigate or attempt to take advantage of programs available to it. For this reason, I find that CHA's decision to vacate and demolish the Charleston Apartments violated § 3604(a) of the Fair Housing Act.
Plaintiffs also assert that both HUD and CHA violated their duties to further fair housing affirmatively. Plaintiffs contend that HUD's approval of CHA's nonrenewal of the HAP contract without the proper one-year notice violates HUD's duty under § 3608(e)(5) of the Fair Housing Act. I have authority to review HUD's decision under the Administrative Procedure Act. See Darst-Webbe Tenant Assoc. v. St. Louis Housing Authority, 339 F.3d 702, 713 (8th Cir.2003).
42 U.S.C. § 3608(e)(5) imposes a duty upon HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." The Eighth Circuit recently summarized this statutory mandate as "an obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply." Darst-Webbe, 339 F.3d at 713.
Plaintiffs have not demonstrated that HUD violated its duty in this case. Plaintiffs seem to be arguing that HUD's duty to further fair housing opportunities somehow required it to "reject" CHA's decision not to renew the HAP contract when the contract expired of its own terms. However, there is no authority for this position in the statute. The decision whether to renew the HAP contract rests entirely with CHA, not with HUD. See People to End Homelessness, Inc. v. Develco Singles Apartments Associates, 339 F.3d 1, 7 (1st Cir.2003). Even if HUD had performed the impact studies suggested by plaintiffs, it could not have used them to require CHA to enter into a new HAP contract, nor could it have "rejected" CHA's decision *944 not to renew the contract. Id. Under these circumstances, I simply do not believe that HUD's duty to further fair housing opportunities is violated.
Plaintiffs also argue that HUD violated its duty to affirmatively further fair housing by approving the opt-out notice. As I discuss below, the one-year notice, while not in exact compliance with the statutory language, was sufficient and accurate. Therefore, even if approval of an opt-out notice could constitute a violation of HUD's duty under § 3608(e)(5) (an issue I do not decide), it cannot form the basis for liability here. For these reasons, plaintiffs' claims against HUD under the Fair Housing Act fail.
Plaintiffs also contend that the Quality Housing and Work Responsibility Act (QHWRA), 42 U.S.C. § 1437c-1(d)(15), imposes upon CHA a similar duty to further fair housing affirmatively. QWHRA requires a public housing agency such as CHA to certify in its annual public housing agency plan that it "will affirmatively further fair housing." 42 U.S.C. § 1437c-1(d)(15). At least one district court has concluded that this provision is privately enforceable, and that its obligations mirror those imposed by the Fair Housing Act. See Langlois v. Abington Housing Authority, 234 F.Supp.2d 33, 72-73 (D.Mass.2002). CHA does not challenge plaintiffs' right to enforce this provision, but simply contends that the public hearings it held to discuss Resolution 604 satisfy this obligation. As plaintiffs and the Langlois court point out, the parameters of a public housing agency's duty to affirmatively further fair housing have yet to be defined. I do not find it necessary to examine this issue in great detail, however, because I find that CHA clearly breached its obligations in this instance. CHA's decision to vacate and demolish the Charleston Apartments violates the Fair Housing Act because it discriminates against African Americans. CHA admitted that it performed no analysis of the racial effect of its decision to vacate and demolish the Charleston Apartments, nor did it investigate alternative options to demolition of the project. Under these circumstances, I find that CHA has violated its duty under the Quality Housing and Work Responsibility Act (QHWRA), 42 U.S.C. § 1437c-1(d)(15), to further fair housing affirmatively.
B. Plaintiffs's claims against CHA under 42 U.S.C. § 1437f, its implementing regulations, the Multifamily Assisted Housing Reform and Affordability Act of 1997 as amended (MAHRA), 12 U.S.C. § 1715z-1b and 42 U.S.C. § 1983, as well as claims for breach of the HAP contract (Counts III, IV and V)
In Count III, plaintiffs bring a § 1983 claim that CHA violated Section 8 of the U.S. Housing Act, 42 U.S.C. § 1437(f), and its implementing regulations, the Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA) by; failing to lease the vacant units; purporting to terminate the contract without proper notice; and refusing to offer residents enhanced vouchers and the choice to remain in the apartment complex. In Count IV, plaintiffs contend that CHA breached the provisions of the HAP contract. In Count V, plaintiffs contend that CHA interfered with the tenants' rights to obtain enhanced vouchers under and 12 U.S.C. § 1715z-1b. For the reasons that follow, I conclude that CHA is entitled to judgment on Counts III, IV and V of the third amended complaint.
1. Enhanced Vouchers
I will deal with the enhanced voucher issue first because it is the easiest. Under MAHRA, when a project-based Section 8 HAP contract is not renewed, the "Secretary *945 shall make enhanced voucher assistance ... available on behalf of each low-income family who, upon the date of such expiration, is residing in an assisted dwelling unit in the covered project." Pub.L. No. 106-74, § 531, 113 Stat. 1113 (Oct. 20, 1999). 12 U.S.C. § 1715z-1b prohibits landlords like CHA from interfering with tenants' efforts to obtain enhanced vouchers.
Enhanced vouchers work like regular tenant-based vouchers or Section 8 certificates, except that they can only be used at the project where the tenants were previously living, not at other Section 8 housing. This, of course, requires that the project continues to operate, and that the new rent for the project is higher than the old rent was. Additionally, it is HUD who issues the enhanced vouchers, not the landlord. For this reason, plaintiffs' claim that CHA violated MAHRA because they refused to "offer" enhanced vouchers fails.
The enhanced voucher program under MAHRA simply has no application here, where the landlord no longer offers the units for rent and intends to demolish the project. The program was designed for situations where the owner of housing that previously qualified as a project-based section 8 project decides to turn that housing into market-rate housing. There are numerous legal ways this can be done, none of which have any applicability here. When that happens, however, the landlord cannot just evict the previous tenants if they cannot pay the increased market-rate rents; instead HUD will issue those tenants enhanced vouchers that would allow them to pay the higher rents without making increased out-of-pocket payments. Thus the program is designed for conversions, not for situations like the one that occurred here. HUD did not issue enhanced vouchers here  it would make no sense for it to do so when the owners did not intend to rent the project at market rates  and CHA had no duty to the tenants with regard to enhanced vouchers and did not interfere with the tenants' rights to obtain them.
Plaintiffs have failed to prove any claim for relief with regard to enhanced vouchers on Counts III and IV of the third amended complaint.
2. Inadequacy of Notice and "Rent Up" Claim
Plaintiffs' claims regarding the one-year notice and rent up issue have some facial appeal, but ultimately they fail as well. Essentially, plaintiffs contend that CHA violated the one-year notice requirement of 42 U.S.C. § 1437f(c)(8) by issuing a notice that deviated from the statute. Although the notice did not follow the statutory language, it would have been misleading had it strictly followed the statute.
Plaintiffs have cited to no law that requires CHA to renew the HAP contract at its termination. Although plaintiffs argue that failing to do so had a disparate impact on African Americans, that in itself cannot give rise to a legal duty independent of the Fair Housing Act to renew the HAP contract. CHA had the right not to renew the contract. Given its decision not to renew, it would have been misleading to use the statutory notice language. The notice sent was accurate and does not violate 42 U.S.C. § 1437f(c)(8).
Plaintiffs are really arguing that the statutorily prescribed notice is more than a notice; it creates a duty to renew the HAP contract and "rent up" the vacant units. There is no authority to support this position, but there is authority that rejects it. The First Circuit Court of Appeals[4] recently held that a HAP contract *946 expires whether or not adequate one-year notice has been given. People to End Homelessness, Inc. v. Develco Singles Apartments Associates, 339 F.3d 1, 7 (1st Cir.2003). Moreover, the court found that HUD had no statutory authority to require a project owner to renew a HAP contract once it expired even if the one-year notice was defective. Id.
In this case, I find that the one-year notice was sufficient and that the HAP contract expired of its own terms. For this reason, plaintiffs have not met their burden of showing any right to recovery on Count III.
3. Breach of HAP Contract/Third Party Beneficiary
Plaintiffs allege in Count IV that CHA breached the HAP contract by failing to rent the apartments, by giving inadequate notice, and by failing to provide enhanced vouchers. Plaintiffs assert that they are third-party beneficiaries of the HAP contract and therefore can bring their own claim for breach of that contract.
Because the HAP contract expired in April of 2001, CHA was not obligated to continue to comply with its provisions. Therefore, CHA cannot be found to be in breach here. For this reason, I need not consider the third-party beneficiary issue. Plaintiffs have shown no right to recovery on Count IV of the third amended complaint.
C. Due Process (Count VI)
Plaintiffs also claim that CHA's failure to provide the one-year notice in exact compliance with 42 U.S.C. § 1437f(c)(8) deprived them of due process in violation of the Fourteenth Amendment. Even if I find that plaintiffs have proven two of the elements necessary to bring this claim (i.e., state action and a protectible property interest), see Hill v. Group Three Housing Development Corp., 799 F.2d 385, 390 (8th Cir.1986), it still fails because I have already decided that the one-year notice provided by CHA complied with the statute. Therefore, plaintiffs have received all the process they are due. CHA is entitled to judgment on Count VI of the third amended complaint.
D. Missouri Administrative Procedure Act (Count VIII)
Plaintiffs also challenge all of CHA's actions in this case under the uncontested case provisions of the Missouri Administrative Procedure Act, Mo.Rev.Stat. § 536.150. MAPA affords a right to judicial review of administrative agency decisions when "any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance shall have rendered a decision which is not subject to administrative review, determining the legal rights, duties or privileges of any person ... and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed...." Mo.Rev.Stat. § 536.150.1. Plaintiffs concede that they cannot seek review of those claims I have already decided on the merits. Essentially, they seek review of their claims under ELIHPA and § 515, which I previously found unenforceable by plaintiffs under § 1983.
CHA does not dispute that its decisions are reviewable as agency action under MAPA, but contends that plaintiffs have not demonstrated that they are entitled to relief in this case. I agree. First, plaintiffs have failed to demonstrate that CHA's decision to prepay the mortgage and vacate and demolish the Charleston Apartments are "decisions ... determining the legal rights, duties or privileges of any *947 person" as required for review as a noncontested case under MAPA.
Second, plaintiffs have not shown that they have standing to seek judicial review under MAPA. To meet this requirement, "[t]he party seeking relief must demonstrate that he has a specific and legally cognizable interest in the subject matter of the administrative action and that he has been directly and substantially affected thereby." Metro Auto Auction v. Director of Revenue, 707 S.W.2d 397, 400 (Mo.1986). "Section 536.150 comprehends only decisions involving individual rights and interests. Thus, to have standing for review under section 536.150, the agency action must affect private rights of the person seeking judicial review." Missouri National Education Association v. Missouri State Board of Education, 34 S.W.3d 266, 275 (Mo.Ct.App.2000) (internal citations omitted). I have already decided that neither ELIHPA nor § 515 confer individual rights enforceable under § 1983, and plaintiffs have pointed to no authority which instructs me to evaluate this requirement differently under MAPA. Plaintiffs therefore lack standing to bring their MAPA claim against CHA. CHA is entitled to judgment on Count VIII of the third amended complaint.
E. Federal Administrative Procedure Act (Count XII)
Plaintiffs also challenge HUD's approval of CHA's opt-out notice and its "acquiescence" of CHA's refusal to renew the HAP contract and rent up the vacant apartments under the Administrative Procedure Act, 5 U.S.C. § 702. Because I have already concluded that the notice was sufficient and that HUD had no right to require CHA to renew the HAP contract, I conclude that plaintiffs cannot demonstrate that they are entitled to relief against HUD under the APA. Judgment will therefore be entered in favor of HUD on Count XIII of the third amended complaint.
F. Uniform Relocation Act (Count VII)
In Count VII, plaintiffs bring a § 1983 claim that CHA violated the Uniform Relocation Act, 42 U.S.C. §§ 4601 et seq., by failing to offer residents the required choices for payment of their moving expenses when it "displaced them from their homes." The URA provides certain benefits to persons displaced by projects undertaken with federal financial assistance. The statute defines "displaced person" as "any person who moves from real property, or moves his personal property from real property .... on which such person is a residential tenant... as a direct result of demolition ... under a program or project undertaken ... with Federal financial assistance." 42 U.S.C. § 4601(6)(A)(i)(II). HCF is not a displaced person under the plain language of the statute and is not entitled to relief. Timothy Owens or Essie McCatrey still reside at Charleston Apartments, so they are not displaced persons, either. Therefore, the only plaintiff potentially entitled to relief under Count VII is Priscilla Johnson, who moved from Charleston Apartments to avoid the proposed demolition.
Although CHA admits that it voluntarily paid Johnson $150.00 in moving expenses, it contends that she is not eligible for relocation benefits as a "displaced person" under the URA because the proposed demolition was not undertaken with federal financial assistance. The URA defines "federal financial assistance" as "a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance...." 42 U.S.C. § 401(4). Plaintiffs contend that the proposed demolition of Charleston Apartments was undertaken *948 with federal financial assistance because CHA used its operating account, consisting of HUD funds and rental payments, to pay for an asbestos inspection by the Missouri Department of Natural Resources.
Plaintiffs have not carried their burden of demonstrating that "federal financial assistance" was used here. I do not find that use of the operating account funds to pay for an inspection of the property means that the proposed demolition was undertaken with "a loan, grant or contribution" from the federal government. As such, Johnson is not entitled to relocation benefits under the URA. See Day v. City of Dayton, Ohio, 604 F.Supp. 191, 197 (S.D.Ohio 1984) (holding that "in order for someone to be a displaced person, there must be some present nexus between a federally assisted program or project and the acquisition of that person's property.").

III. RELIEF

Plaintiffs have prevailed on their Fair Housing Act claims against CHA and Page and are accordingly entitled to declaratory and injunctive relief. See 42 U.S.C. § 3613(c)(1). Having concluded that CHA's policy to vacate and demolish Charleston Apartments has a racially discriminatory effect, the Court declares that defendants CHA and Page denied and made housing at Charleston Apartments unavailable because of race in violation of the Fair Housing Act, 42 U.S.C. § 3604(a). In light of this conclusion, the Court also permanently enjoins defendants CHA and Page, and those in active concert and participation with them, from denying or otherwise making any dwelling unavailable to any person because of race or other status protected under the Fair Housing Act.
I am not granting plaintiffs' request to order CHA to rent up the Charleston Apartments. I do not believe this requested relief is either necessary or appropriate in this situation, particularly in light of my decision that the HAP contract expired and that plaintiffs lack standing to enforce their ELIHPA and § 515 claims. In addition, I have determined that ELIHPA applies to CHA's request to prepay their loan and that CHA is required to comply with its provisions. USDA is charged with enforcing ELIHPA and its accompanying regulations, and the parties have stipulated that USDA will comply with its obligation to do so. For these reasons, I am not ordering CHA to rent up the Charleston Apartments as a remedy for its violation of the Fair Housing Act.
I also find that CHA's decision to vacate and demolish the Charleston Apartments without considering the discriminatory effect violated its duty to further fair housing affirmatively under the Quality Housing and Work Responsibility Act, 42 U.S.C. § 1437c-1(d)(15). Plaintiffs have cited no authority, however, that would permit me to order CHA to rent up the Charleston Apartments for CHA's failure to comply with the statute. Therefore, plaintiffs' request for affirmative injunctive relief is denied.
I am entering a separate Judgment in accordance with this Memorandum Opinion and my prior summary judgment Order dated May 5, 2003 in this case and in Case Number 1:01CV101 CDP.

MEMORANDUM AND ORDER
This matter is before me on plaintiffs' motion to alter or amend my March 11, 2004 judgment under Rule 59(e) of the Federal Rules of Civil Procedure.[1] *949 Plaintiffs contend that the injunctive relief I awarded lacks specificity and should be amended to require Charleston Housing Authority to rent up the vacant units at Charleston Apartments. I initially denied this request, in part because CHA's HAP contract had expired and plaintiffs lacked standing to enforce many of their statutory claims. However, upon careful reconsideration, I agree that the equitable relief I previously granted is insufficient to remedy the effects of defendants' violations of the Fair Housing Act. I will therefore amend my prior judgment to this extent  CHA is required to repair, maintain and operate Charleston Apartments as low-income housing and in doing so shall comply with all applicable statutes, regulations and guidelines. I believe this award meets the specificity requirements of Rule 65 of the Federal Rules of Civil Procedure and remedies the effects of the discriminatory decision to vacate and demolish the Charleston Apartments by requiring CHA to reopen and maintain the apartment complex as low-income housing.
I do not believe a more specific injunction is appropriate in this case. I continue to believe that it is the primary responsibility of the USDA to monitor and, if necessary, to enforce CHA's compliance with the housing regulations and laws at issue here. Under the stipulation for judgment between USDA and plaintiffs, USDA has agreed to do so here. Now that I am ordering CHA to reopen Charleston Apartments, I believe the regulatory process can operate as intended without unnecessary interference or oversight by this Court.
To the extent plaintiffs are seeking more extensive injunctive relief, I am denying their request. I do not believe that plaintiffs are entitled to their request for an injunction that requires full occupancy at the apartment complex if, for example, the applicable regulations do not impose that requirement on CHA. Similarly I do not believe that CHA should be required to accept "households displaced from Charleston Apartments who wish to return" if they would not otherwise be eligible for occupancy there absent an injunctive award. To the extent that those displaced tenants remain eligible for residency at Charleston Apartments, however, I will order that they be allowed first priority to return if interested.
Plaintiffs are entitled to an injunction to redress CHA's discriminatory decision to vacate and demolish Charleston Apartments. The judgment will accordingly be amended to provide that relief.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs' motion to alter or amend the judgment [# 178] is granted in part and denied in part as set forth above.
An Amended Judgment in accordance with this Memorandum and Order and my prior Orders is issued this same date.
NOTES
[1] Although Frances Hines is no longer a plaintiff, I will from time to time continue to refer to the Hines plaintiffs, to distinguish them from the plaintiffs in the USDA action.
[2] The USDA action was originally filed as Case No. 1:01CV101 CDP, and that file has been administratively closed as a result of its consolidation with Case No. 1:01CV70CDP.
[3] In December of 2000, Page submitted to HUD a 120-day written notice confirming CHA's intent to opt out of the HAP contract. CHA also provided a 120-day written confirmation notice to tenants of the apartment complex. The content of the 120-day notice to tenants was essentially the same as its one-year notice.
[4] The Honorable Richard S. Arnold of the Eighth Circuit Court of Appeals, sitting by designation, was on the panel that decided this case.
[1] Rule 59(e) permits me to correct manifest errors of law or fact or to consider newly discovered evidence. Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills, 141 F.3d 1284, 1286 (8th Cir.1998). Although plaintiffs submitted evidence they claim is "newly discovered" in support of their motion, I need not consider it because I believe that my failure to award sufficient injunctive relief to remedy defendants' violation of the Fair Housing Act amounts to a manifest legal error.